ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of --                              )
                                           )
South Carolina Public Service Authority    )    ASBCA Nos. 60460, 60616
                                           )
Under Contract No. DACW60-77-C-0005        )

APPEARANCE FOR THE APPELLANT:              Megan E. Driggers, Esq.
                                             Counsel

APPEARANCES FOR THE GOVERNMENT:            Michael P. Goodman, Esq.
                                             Engineer Chief Trial Attorney
                                           John P. Kassebaum, Esq.
                                             Engineer Trial Attorney
                                             U.S. Army Engineer District, Charleston

OPINION BY ADMINISTRATIVE JUDGE MCNULTY

     Appellant, South Carolina Public Service Authority (the Authority or appellant) appeals from a denial of its claim that the government acting through the U.S. Army Corps of Engineers, is improperly demanding payment for additional electrical generation capacity provided to the Authority from the government's St. Stephen hydroelectric power plant pursuant to an agreement the parties entered into in 1976. We deny these appeals, though, in accordance with the Board's internal operating procedures, this decision has no precedential value because Judges Shackleford and Prouty concur only in result.

FINDINGS OF FACT[1]

*The Basis for the Contract*

    1. The contract at issue in these appeals reflects the settlement of a potential claim the Authority had against the government arising from the government's

---

[1] Findings of fact without citation to the record are borrowed, with deletions, paraphrasing and summarizing as appropriate for these appeals, from previous decisions relating to the contract, primarily *South Carolina Public Service Authority*, ENG BCA No. 5564, 89-3 BCA ¶ 21,921, and *South Carolina Public Service Authority*, ENG BCA No. 5564, 91-2 BCA ¶ 23,760. *See also South Carolina Public Service Authority*, ASBCA No. 53701, 04-2 BCA ¶ 32,651; and *South Carolina Public Service Authority*, ASBCA No. 57826,

decision to reduce the shoaling occurring in the Charleston, South Carolina harbor caused by the increased discharges of water into the Cooper River resulting from the Authority's construction and operation of the Santee Cooper Project, by reducing the discharge of water into the Cooper River from the Santee River. The reduction of water discharges into the Cooper River adversely affected the Authority's ability to generate power.

2. The Santee Cooper Project was constructed by the Authority pursuant to a license granted to it in 1926 by the Federal Power Commission (now FERC), beginning in the late 1930's. The project was designed to harness the hydroelectric power capability of the Cooper River as enhanced by the discharges from the Santee River.

3. After a lengthy period of study in the 1960's, the government proposed rediverting the water into the Santee River and through a new hydroelectric plant to be built by the United States Army Corps of Engineers, with the generating capacity and energy from this new facility being provided to the Authority as compensation for the loss of water and energy resulting therefrom at the Authority's Santee Cooper Project's Jeffries plant. This plan is referred to by the parties as the "St. Stephen Plan."

4. The Authority preferred an alternate plan, the "Price Inlet Plan" because it would not have affected the generating capacity of its Jeffries plant (R4, tab 10 at 346 ¶ 10b).

5. The Authority did not favor the St. Stephen plan because it would "create unsalable peaking capacity," as well as result in a loss of energy from the Jeffries plant. Nevertheless, the Authority agreed to work with the government to develop the St. Stephen plan under the principle that the Authority would be "kept whole," made

13 BCA ¶ 35,239. However, familiarity with these prior decisions, which include lengthy findings of fact setting forth in great detail most of the details relating to the purpose of the Santee Cooper Project and the contract's negotiation and performance is presumed. In *Blue Cross Association & Blue Shield Association*, ASBCA No. 25944, 83-1 BCA ¶ 16,524, we stated that we can take official notice of findings of fact made in prior appeals involving the same parties, contract, counsel and tribunal. Although these appeals involve a different tribunal and counsel with respect to some of the decisions above, we are satisfied, based on our review of the record here, that the previous findings we have borrowed, paraphrased and summarized are accurate and that it is appropriate to take official notice thereof for these appeals.

neither better nor worse off as a result of the project.[2]  The contract between the parties subsequently negotiated was based on the "keep whole" principle.

6.  As part of this principle the Corps, in a 1966 study, recommended that the government be reimbursed by the Authority for the "betterments," i.e., the additional power generated by the St. Stephen plan made available to the Authority.  In this regard the study stated:

> It is recommended as an equitable solution that the hydro plant be constructed, maintained and operated by the Corps of Engineers; that the power and energy produced be delivered to and as directed by the South Carolina Public Service Authority; that the Corps will be liable for damages resulting from project construction and operation; and that project betterments be reimbursable to the United States.

(R4, tab 9 at 160, tab 10 at 278)

7.  The study analyzed several alternative plans, including the hydroelectric plant and related facilities ultimately built.  The initial cost estimate from the 1966 study for this plan estimated a total federal investment of $37,592,000 based on an estimated cost of $35,381,000 plus $2,211,000 in interest and annual charges of $1,687,000.  (R4, tab 9 at 197, 214)  The initial estimate of the value of the betterment of the added dependable capacity was $773,000 per year based on $9.20 per kw year (*id*. at 203 ¶ 85).  The study also indicated the "Net Power Benefits" would total $417,000[3] per year, which would have the effect of reducing the annual charges from $1,687,000 to $1,270,000 (*id*. at 204).

8.  All of the project cost analyses performed in the government's study were based upon a 50 year economic life for the hydro plant (R4, tab 9 at 226).  The basis for the 50 year period for economic analysis of hydroelectric plants is set forth in the Federal Power Commission's "Hydroelectric Power Evaluation" (R4, tab 11 at 517).  In contrast, thermal plants, which the FPC/FERC methodology uses to compare to as the alternate power source when evaluating hydro plants, are considered to have 30-35 year service lives (finding 32).

9.  The annual value of hydroelectric power consists of two measurable components which are defined as follows:  (1) a capacity value, which corresponds to

---

[2] The Authority expressed its understanding that the "kept whole" concept had been agreed to in principle by the government as early as 1966 (R4, tab 10 at 449).

[3] How this figure was derived is not set out in the study.

the fixed elements of the cost of power supply from an alternative electric generating plant; and (2) an energy value, which corresponds to the variable elements of the cost of power supply from the alternative plant (R4, tab 11 at 596).

10. The 1966 study included a letter from the Authority dated May 5, 1966, setting forth terms that subsequently, essentially became the agreement between the government and the Authority (R4, tab 9 at 218-22). The letter set out the principle that the Authority was to be made "whole" by the government, which would compensate the Authority annually for the reduced flow of water through the Jefferies plant and its detrimental effect on the Authority's power generating. The letter also set forth the concept that the Authority would credit the government for the added power generating capacity that the new St. Stephen plant would provide and that title to the new plant would transfer to the Authority after 50 years, if not sooner by agreement of the parties. (*Id*. at 219-20)

11. The study's findings were incorporated into the Corps' report to Congress that is included in Senate Document No. 88, 90th Congress, 2nd Session (S. Doc. No. 88), which provided the basis for Congress' approval of the St. Stephen project as part of Pub. L. No. 90-483 (1968) (R4, tab 10 at 267-69, 279-483).

12. In S. Doc. No. 88, Congress indicated that FPC (FERC) would be the arbitrator of disputes on the issue of appropriate compensation to make the Authority whole. However, the authorizing document, Pub. L. No. 90-483 (1968), said that the Corps and the Authority should consult with the FPC (FERC) regarding the yearly balancing of energy loss and capacity gain to make the Authority whole.

13. S. Doc. No. 88 included, among other things, a report from the Chief of Engineers to the Secretary of the Army. In his cover letter dated December 29, 1967, the Chief of Engineers addressed, in pertinent part, the costs of the rediversion project:

> The District and Division Engineers estimate the Federal construction cost at $ 35,381,000, which includes provisional fish and wildlife features. Annual charges are estimated at $1,687,000, including $191,000 for operation and maintenance. A net power betterment presently estimated at $417,000[4] annually to be subtracted from this amount would bring the net annual charges to $1,270,000. Annual benefits [savings from less government-funded maintenance dredging in Charleston Harbor] are estimated

---

[4] This figure appears to have been carried over from the 1966 study (finding 7). Once again how this figure was derived is not set forth in the report.

4

at $2,750,000 and the benefit-cost ratio is 2.2 based on a 50-year period of analysis.

the . . . Secretary. . . acting through the Chief of Engineers, would be authorized to determine and enter into agreement with [the Authority], for apportionment of costs between the United States and [the Authority]. . . . The Board [of Engineers for Rivers and Harbors] includes the recommendations that the Secretary . . . acting through the Chief of Engineers, be authorized to negotiate with [the Authority] for a limitation of releases from Pinopolis Dam to Cooper River . . . and to reimburse the Authority for the cost involved, provided that reimbursement shall not exceed estimated average attendant reductions in the Federal cost of maintenance of Charleston Harbor as determined by the Secretary. . . .

14. On August 13, 1968, Public Law No. 90-483, entitled "Public Works -- Rivers and Harbors," was enacted. Title I of that law "adopted and authorized" the Army's plans and recommendations in S. Doc. No. 88 for the "improvement of rivers and harbors and other waterways for navigation, flood control and other purposes." Pub. L. No. 90-483 authorized the government and the Authority to negotiate an agreement to apportion between the costs of lost energy and the value of the betterment of increased capacity in furtherance of the congressional purpose of maintaining the Authority's system in a sound condition by keeping it whole after the completion of the project.

15. The project was listed in the Act with an estimated cost of $35,381,000.[5] Pub. L. No. 90-483.

16. Section 101 of the Act authorized the Secretary of the Army with the supervision of the Chief of Engineers to prosecute the Santee Cooper rediversion project, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the designated report, S. Doc. No. 88. Pub. L. No. 90-483. The referenced recommendations appear in paragraphs 111 to 114 of the report (R4, tab 10 at 245, 325-27). With respect to the increased capacity to be provided by the construction of the St. Stephen hydroelectric plant, the following recommendation was made:

b. The costs to the United States shall not include any betterments to others arising from the increase in

---

[5] The Act authorized many projects in addition to the rediversion project involved in these appeals.

5

> capacity provided. The Secretary of Army, acting through the Chief of Engineers, is authorized to determine and enter into agreement with South Carolina Public Service Authority or its successors in interest, for apportionment of costs between the United States and the South Carolina Public Service Authority. Such determinations will be accomplished in consultation with the Federal Power Commission.

(*Id*. at 325) This mirrors the recommendation first made by the Corps in 1967 (*id*. at 275-76).

17. The net power benefit reported was estimated to be $417,000 annually[6] (R4, tab 10 at 317). In 1966, the Authority proposed that at the end of each year of operation of the St. Stephen project that there be a cash settlement of the various credits to be paid and that the agreement be in effect for 50 years (*id*. at 333-35). With respect to the credit to be paid to the government for the dependable capacity of the St. Stephen plant the Authority stated:

> The amount of this credit is still open. We estimate that the fair value to the Authority of the capacity used, which will be available only a small percentage of the time, is $6 per year per kilowatt based on studies which we have made available to you. The Corps estimates present-day capacity values at $9.20 per year per kw under pooling concepts, and $11.05 per year per kw under isolated systems operation concept.

(*Id*. at 333) The Authority also suggested that disputes regarding the amount of the credits be referred to the FPC for resolution (*id*. at 334 ¶ (d)).

18. Over a period of eight years, but principally in 1974, 1975, and 1976, the government and the Authority negotiated the contract here at issue in accordance with the congressional authorization referenced above.

19. The record includes evidence that the initial contract agreement was drafted by Sverdrup and Parcels (S&P), a consultant to the government in 1974 (R4, tab 12 at 608). S&P also prepared a report for the government in 1974, in which S&P determined values for capacity and energy, established the values for the betterments resulting from the rediversion project and estimated the operation and maintenance costs for the proposed St. Stephen plant (R4, tab 13 at 626). S&P estimated the then

---

[6] Again, how this figure was derived is not set out in the report.

present worth of the St. Stephen capacity to be $35,111,500 over 50 years. S&P also noted that the actual value for any particular year would depend on the maximum capacity utilized in that year. (*Id*. at 640) This estimate was based on the FPC methodology using an equivalent steam-electric plant as the alternate for comparison purposes (*id*. at 641).

20. A government letter dated March 28, 1975 indicates that the values for capacity and energy calculated by the FPC and S&P have varied considerably at different points in time as follows:

| Item | FPC 4 May 65 | FPC 28 Apr 71 | FPC 22 Jun 73 | S&P 1 Jan 74 |
|---|---|---|---|---|
| Capacity | $16.20 | $17.50 | $40.55 | $29.81 |
| Energy | 3 mills | 4.85 mills | 4.40 mills | 7 mills |

(R4, tab 15 at 717)

21. On February 17, 1975, the government sent the first draft of an agreement to the Authority. It contained no values calculated for energy or capacity. At approximately the same time, the government requested the Federal Power Commission (FPC) to provide updated capacity and energy values for the project. The FPC calculated a capacity value for the hydropower facility of $34/kW/yr. based on the cost of constructing a steam electric facility alternative which would produce the equivalent capacity of the hydropower project. Capacity is the capability of the project to produce energy over a period of time.

22. Following initial contract negotiations, the Authority's General Manager and the Charleston District Engineer signed a draft contract, subject to the approval of the Chief of Engineers. A significant feature of the draft contract was that the Authority would pay for the project's added dependable capacity when used in any one year. During negotiations, the parties consulted the FPC manual P-35, "Hydroelectric Power Evaluation," as a reference to define "dependable capacity." "Dependable Capacity" is defined therein as the capacity that can be relied upon to carry a system load during the most adverse flow conditions of record. The contract, however, contains no definition of the term.

23. The parties executed an agreement in December 1975, which ultimately was not approved, as required, by the Chief of Engineers because a government representative expressed concern that the government would not be sufficiently compensated for the added capacity provided to the Authority by the project under the agreement as then drafted (R4, tab 40 at 1204 ¶¶ 2, 31).

24. The record indicates that one of the stumbling blocks to achieving a final agreement was the difficulty in estimating the value of the Jefferies plant after the rediversion (R4, tab 41 at 1208 ¶ 2). To get past this obstacle to achieving the agreement the government, with consensus from the FPC, decided that the project gains and losses would offset each other, at least for the initial years of the contract, despite the government's long held view that the power benefits provided by the project exceeded the value of the power losses (R4, tab 42 at 1208 ¶¶ 3-4, tab 48 at 1270).

25. The record reflects that before the contract was signed, the parties had differing approaches with respect to calculating the capacity value. The Authority used a gas turbine for the replacement source, whereas the government used a steam electric plant as the replacement source. (R4, tab 26 at 997 ¶ m) The parties, over a long period of time, negotiated the costs to be used in exhibit A to generate the capacity and other values (R4, tab 28 at 1038, ex. A at 1066, tab 30 at 1076, ex. A at 1106-11, tab 32 at 1161, ex. A at 1163, tabs 36, 38, ex. A at 1184-90, tabs 51-52). The values derived underwent significant revisions as the parties revised the assumptions they used regarding the numerous variables in the analysis (R4, tab 32 at 1156, tabs 37-38). Furthermore the various factors used in the various methods that the parties considered during the period of negotiation in addition to being difficult to estimate could lead to significant changes in the credits to be paid, such that one method might result in a net credit to be paid to the Authority, while another method might result in a net payment to the government (R4, tab 39 at 1198-1203).

26. The parties were unable to agree, or awaited the development of information in the future regarding several issues and deferred decision in the contract on these issues. One of the principal examples of this is the decision to defer deciding what to do with respect to the "objectionable heat rise during cooling of the Jefferies steam plant. (R4, tab 32 at 1157, tab 2 at 12, 16 ¶ 1.7)

27. The record includes evidence that the Authority was concerned that the energy value for gas turbines was hard to evaluate for a 50 year project life (R4, tab 38 at 1179-80 ¶ VI. 2).

28. Despite the continuing objections of the Authority to the value (provided by the FPC) to be placed upon the 84 Mw of added dependable capacity, it never objected to the determination of 84 Mw as the added dependable capacity. Though the contract contained variables for determining the credit value for the 84 Mw of dependable capacity to be given the government and left the final determination of the value to be decided at a later date under a prescribed formula, the fact of 84 Mw of added dependable capacity was an unambiguous term and requirement of the contract.

8

29. The following evidence substantiates the general agreement by the negotiating parties as to the FPC Manual and the accepted industry definition of "dependable capacity," as well as the fact that the project provided 84 Mw of added dependable capacity.

a. The discussion of "dependable capacity" during negotiations centered upon whether the 84 Mw of added dependable capacity was to be evaluated in accordance with the combustion turbine alternative or the steam electric alternative.

b. The Authority first stated in its revision of the contract draft of 1 July 1975, that the capacity of St. Stephen would be 84 Mw.

c. The draft contract of 18 July 1975, explicitly referred to the dependable capacity at St. Stephen's to be 84 Mw and Jefferies to be 128 Mw of existing capacity.

d. The reference to 84 Mw dependable capacity continued, without modification or discussion, through succeeding drafts.

e. The Authority's expert during negotiations recommended that the 84 Mw dependable capacity be modified to include a potentially higher dependable capacity by the inclusion of the words "presently expected to be." This was used in the next three drafts of the contract. At this time, the Authority was concerned that all the added dependable capacity at the project would be available to it and not made available to another power company.

f. Following additional discussion between the parties about the contract terms, wherein dependable capacity was not an issue, the Authority, in an internal memorandum, stated that, after diversion, St. Stephen would have a capacity of 84 Mw and Jefferies would have a capacity of 128 Mw.

g. At a meeting between the parties on September 15, 1976, the Authority disputed the FPC's value for the added capacity of 84 Mw but did not contest the validity of the 84 Mw dependable capacity determination.

h. Draft contracts of September, 1976, eliminated the expression "presently expected to be" in front of the "84 Mw dependable capacity" and provided for a formula to value the 84 Mw added dependable capacity at a date closer to the date the St. Stephen's facility would be placed into operation. There was no provision for or discussion of reevaluating the 84

Mw dependable capacity assessment either in the subsequent negotiations or contract.

i. The Authority objected to the provisions of the draft contract which provided for "no cash flow from the government to the Authority" and which did not include a "four year buildup" for the Authority to utilize the 84 Mw of added dependable capacity in its system.

j. The contract was signed in 1976 with the term "84 Mw dependable capacity" included, with a buildup provision for the Authority's inclusion of the added 84 Mw into its system, and with a provision to place a value on the 84 Mw of added dependable capacity at a time 18 months before operation of the project.

k. The Authority's president in a public speech delivered after the signing of the contract, spoke of the St. Stephen's project as providing 84 Mw of additional dependable capacity.

30. In summary, during the pre-contract negotiations, as well as subsequent to execution of the contract, the Authority raised issues concerning: the fitting of the added capacity into its load curve; increasing the flow allowances to permit more efficient and easier utilization of the added capacity; valuing the added capacity as combustion turbine rather than steam plant; determining the value of the added capacity at a time closer to project operation; and, a buildup period for the Authority's utilization of added capacity. But the Authority did not raise concerns about the issues concerning the validity of the determination that 84 Mw of added dependable capacity would be provided by St. Stephen's or that 84 Mw of added dependable capacity would be usable in its system.

*Hydropower Adjustment Factor* (*HAF*)

31. The FPC Manual P-35, Hydroelectric Power Evaluation, was used within the hydropower industry during the mid-1970's as a guideline and was used by the parties as a basis for contract negotiations. The manual states, on page 23 that "usually the credit per kilowatt of capacity will range from 5 to 15 percent of the cost per kilowatt of thermal capacity." This percentage is referred to as the HAF.

32. FPC used a thirty-year service life in its analysis for calculating the value of the added dependable capacity because that is the expected service life of a thermal plant and hydro plants are appraised by assessing the costs of a similarly sized thermal plant and making an adjustment with the HAF calculation for the added benefits/efficiencies associated with a hydro plant. Hydro plants are assumed to have

a service life of 50-100 years.  (R4, tab 1 at 4-5, tab 11 at 498, 516-18, 521, 525, 578, 587-88, 590)

33.  Using the FPC manual, the hydropower adjustment factor (5-15 percent) is multiplied by the thermal (steam or gas) equivalent of hydropower with the result added to the thermal equivalent to determine the total capacity cost equivalent of thermal to hydropower.

34.  The purpose of adding the hydropower adjustment factor to the thermal capacity cost is to recognize the benefits of hydropower's operating efficiency and to make a comparison between hydro and thermal power more reasonable and accurate. Hydropower plants are appraised using a methodology in which it is assumed that the utility must build either a coal-fired steam plant or a gas combustion plant rather than a hydroplant to achieve the same capacity.  Once the value of such a plant is calculated in terms of an annual capacity cost, that figure is then adjusted by the hydropower adjustment percentage to reflect the increased value of the plant because of its use of water.

35.  During negotiations, the parties disagreed upon the appropriate percent of the hydropower adjustment factor (HAF); but they did not dispute that an adjustment was appropriate.  The government used a 10% HAF in its first draft contract, but the Authority, contended for a 5% or 0% HAF.  Following numerous drafts containing a 10% HAF, the Corps prepared and the Authority signed a contract which contained a 5% HAF for the combustion turbine alternative and a 10% HAF for the steam alternative.  The draft contract containing this agreement was not approved, as required, by the Chief of Engineers, because the contract did not establish a firm date for the Authority's liability to pay for the added dependable capacity.

36.  After the Chief of Engineers disapproved the proposed contract, later drafts contained a 10% HAF in place of the 5% HAF in the disapproved contract.  The final approved contract contained, in exhibit A, a 10% HAF for all calculations.  The contract contains no provision for later adjustment of the 10% HAF.  Section 6.1 of the contract specifically states that "The value of capacity and energy credits shall be computed in accordance with the procedure shown in exhibit A."  Pages A-4 and A-5 of appendix A show the method of calculating capacity value for both the steam electric equivalent and the gas turbine equivalent.  Both show a 10% HAF multiplied against a calculated "annual capacity cost" with the result of the multiplication added to the "annual capacity cost" to establish the "total capacity cost."  This is not the procedure advocated by the Authority previously, which instead would have calculated an HAF to be multiplied with the "annual capacity" cost to establish the "total capacity cost" rather than add the percent HAF to the "annual capacity cost."

11

37. The contract executed by the parties provided for inter alia the following key components:

> a. A determination that 84 Mw added dependable capacity would be furnished by St. Stephen's;
>
> b. A 10% HAF to be applied to the thermal equivalent;
>
> c. Valuation of the 84 Mw added dependable capacity at the gas turbine equivalent rather than apportioned between steam and gas turbine equivalents;
>
> d. A three-year phase in by the Authority in using the 84 Mw of added dependable capacity within its system; and
>
> e. Provision for quantification of the value of the added 84 Mw dependable capacity 18 months prior to operation of the project.

Other than the 84 Mw of added dependable capacity, which was accepted by the parties, the parties negotiated in great detail all the other above provisions.

*Contract No. DACW60-77-C-005*

38. On December 27, 1976, the Authority and the government entered into the contract. As reflected in its second to the last recital, the contract incorporated the principles of agreement that the Corps had reported and recommended to Congress, and that Congress had adopted and authorized in Pub. L. No. 90-483. In the last recital, the parties stated their intent that the contract effectuate the "make whole" principle:

> WHEREAS, the parties desire that the Government be compensated for the Project's benefits to [Santee Cooper] and that [Santee Cooper] be compensated for the adverse effects of the Project.

(R4, tab 2 at 13)

39. This "make whole" principle is accomplished under the contract by a system of credits and annual payments. In general, section 6 of the contract provides that the government credits the Authority for the value of lost energy on account of the project, while the Authority credits the government for the value of the capacity added by the St. Stephen project. These credits are adjusted by various provisions of the contract, including section 10, which provides that the credit to the government for additional capacity is reduced when that capacity is unavailable because of an

12

unscheduled outage. Section 7 of the contract provides that there shall be a cash settlement each year reflecting the balance of credits and adjustments.

40. Exhibit A to the contract provides a formula, or methodology, for calculating the values of capacity of both steam and gas combustion equivalent capacity. At paragraph 6.1, the contract provides that the parties are to establish these values using the exhibit A formulas in consultation with the FPC (now FERC) at a point in time 18 months before the anticipated date of commercial operation of the rediversion project. Anticipating completion of the project in early 1985, the government began to coordinate with FERC in 1982 concerning the appropriate numbers to be used in the formulas to calculate steam and gas combustion capacities. The government sought to have the calculations subsequently provided by FERC approved by the Authority. The Authority refused to agree with these calculations, taking issue with the number used by FERC in the hydropower adjustment portion of the formula. The disagreement on this point arose from the parties' different views as to the effect on the value of the plant capacity.

41. This disagreement was the subject of the dispute in *South Carolina Public Service Authority*, ENG BCA No. 5564, 89-3 BCA ¶ 21,921 and 91-2 BCA ¶ 23,760.

42. Section 1.3 of the contract states:

> Transfer title to Project facilities and real estate to the Authority at the end of a 50-year term commencing on the date of commercial operation specified in paragraph 3.2. At anytime during the period of this contract, the parties may agree to advance the transfer of title upon a lump sum settlement. Such settlement would be in an amount agreed to represent the then present worth of the estimated credits under Section 6 during (a) the then estimated remaining service life of Jefferies and (b) the remainder thereafter of the fifty year period specified in paragraph 3.2.

(R4, tab 2 at 15)

43. Section 2 of the contract required the Authority among other things to: (i) restrict its use and release of water into the Cooper River from its Jefferies hydroplant in accordance with limits specified by the government; (ii) maintain and operate the cooling water system to be constructed by the government; (iii) maintain project transmission lines, government meters on the Authority's premises, and such other facilities as may be mutually agreed upon; (iv) operate the St. Stephen hydroplant by remote control equipment provided by the government; (v) maintain the remote control equipment at government expense; and (vi) at Section 2.4:

13

Make the maximum use of the additional capacity
resulting from the combined two-plant operation which the
Authority deems economical and practical in light of water
availability, load conditions, costs and other operating
considerations. Credit the Government for the value of the
increase in useful capacity of Jefferies and St. Stephen
created by the Project, as determined pursuant to Section 6.

(R4, tab 2 at 19)  The foregoing services were essential services for the commercial
operation of the project.

44.  Section 3.2 states:

All obligations of the parties hereto with respect to
the delivery of power and payment therefor and reduction
of discharges from Jefferies shall commence at such time
as all three units at St. Stephen are placed in commercial
operation (herein called the date of commercial operation),
and shall continue in effect for fifty years, after which
ownership shall pass to the Authority pursuant to
paragraph 1.3. At the option of the Authority, transfer may
be effected at an earlier date, on 90 days written notice
after details of the transfer have been agreed upon between
the Authority and the Government.

(R4, tab 2 at 21) (emphasis added)

45.  The contract provisions pertinent to the settlement of the parties' respective
credit obligations are:[7]

SECTION 6.  Settlement.

Beginning with the date of commercial operation
*and continuing for each succeeding contract year*, ending
on the 30th day of June, or any partial initial or final year
of this Contract, *there shall be a cash settlement between
the Government and the Authority, reflecting the net of*:

---

[7] The Board only sets forth in this decision a limited portion of section 6, Settlement.
In its entirety the settlement section includes four pages of the contract and ten
detailed pages of appendices.

14

6.1 Appropriate credits for increased available capacity and loss of energy generation resulting from using some of the water through the lower head at St. Stephen instead of using it at Jefferies. . . . Values will be obtained as follows for use in computing appropriate credits for capacity and energy in Exhibit A:[8]

a. On or before March 1, 1982, the Government shall furnish the Authority an expected date of commercial operation. The values of capacity shall be fixed as of a date which is 18 months prior to such expected date of commercial operation. Such values will be established by the parties after consultation with the Federal Power Commission and will prevail for a 30-year service life.

b. Current energy value for gas turbine equivalent will be obtained from the Federal Power Commission. A new value will be obtained from the Commission before each June 30 to apply throughout the ensuing year.

c. Current energy value for the Authority system will be obtained monthly from the Authority using procedure shown in Exhibit C.

6.2 Pursuant to paragraph 2.3, a credit to the Government for any weekly average discharge which exceeds by more than 100 cfs the discharge provided for in paragraph 2.1. The procedure for computation of credit is displayed in Exhibit B.

. . . .

6.4 A credit to the Authority for the adverse effect of St. Stephen on the rights the Authority has acquired and the facilities it has installed in preparation for expanding its hydro plant at Jefferies. The amount of this credit shall be determined according to the procedure displayed in Exhibit D.

. . . .

---

[8] The parties replaced exhibit A in 1995 with a revised version in supplemental agreement No. 6 (R4, tab 2 at 80 ¶¶ 10, 81-85).

6.6  A credit to the Authority pursuant to paragraph 1.7 for all actual operation and maintenance costs of the cooling water system referred to therein incurred by the Authority (including capacity and energy valued in accordance with Exhibits A and C) over and above any such operation and maintenance costs required in the absence of the Project.

6.7  . . . The capacity and energy values will be computed using the values and procedures in Exhibits A and C, respectively.

. . . .

SECTION 7.  Payment.

*Payments under this contract shall be made until title passes to the Authority pursuant to the provisions of paragraph 1.3.*  Payment shall be made yearly in the form of a cash settlement between the Government and the Authority pursuant to the provisions of Section 6. Payment shall be due on the 91st day following the 30th day of June for each year of operation (1 July-30 June) or partial year of operation of the Project from and after the date of commercial operation.  If either party shall fail to make any payment under this contract within 30 days of the date due, interest thereon shall accrue at a rate to be determined in accordance with the provisions of Section 8. The yearly payments shall be based on monthly settlement statements prepared by the Authority and furnished to the Contracting Officer within 20 days following the end of each month.  In the event of a dispute as to the correct amount due, any net undisputed amount shall be paid when due.

Procedure for Computation on
an Annual Basis for Capacity and
Energy of Combined Two-Plant
Operation of St. Stephen and Jefferies Hydro Plants*

## 1. POWER QUANTITIES
### JEFFERIES (BEFORE REDIVERSION)

| | | |
|---|---|---|
| A | Capacity | = 128,000 KW (1) |
| B | Energy - Amount that could have been produced annually by A above.  See page A-6 for computation. | = 657,000,000 KWH (2) |

### ST. STEPHEN

| | | |
|---|---|---|
| C | Capacity | = 84,000 KW (1) |
| D | Energy - Amount attributable annually to C, above. | = 418,000,000 KWH (3) |

### JEFFERIES (AFTER REDIVERSION) Based on 3000 cfs total average flow.

| | | |
|---|---|---|
| E | Capacity - Steam electric equivalent | = 44,000 KW (4) |
| F | Capacity - Gas turbine equivalent | = 84,000 KW (4) |
| G | Energy - Amount generated annually by E, above | = Varies (5) |
| H | Energy - Amount generated annually by F, above | = Varies (5) |

(1)  Will be reduced when units become unavailable for service other than for maintenance, repair or replacement or their physical capability is permanently reduced.

(2)  Amount shown is based on estimated average annual generation for period of flow record.  Annual amounts will be computed as shown on page A-6.

(3)  Amount shown is based on estimated average annual generation for period of flow record assuming a rediversion of flow.  Annual computation will utilize metered amount actually generated.

(4)  The distribution of capacity at Jefferies after rediversion will be 44,000 kw steam electric equivalent and 84,000 kw gas turbine equivalent under the 3,000 cfs/weekly average flow condition.  If the flow at Jefferies is changed, the amount of base load will be reevaluated pursuant to paragraph 1.4.

(5)  The combined energy of G and H has an estimated average annual value of 129,000,000 KWH based on rediversion of all flow except 3000 cfs.  Annual determination of energy and its distribution shall depend on metered generation distributed pursuant to procedure in paragraph 6.1.

*Monthly settlement statements will be on a prorated basis.

## 2. POWER VALUES

### CAPACITY

| | | |
|---|---|---|
| R | Steam electric base | $48/KW (6) |
| S | Gas turbine base | $11.85/KW (7) |

### ENERGY

| | | |
|---|---|---|
| T | Steam electric | 10.76 mills/KWH (8) |
| U | Gas turbine | 36.8 mills/KWH (9) |

## 3. COMPUTATION

| | |
|---|---|
| Value of Jefferies (before rediversion) | $+(AR+BT)$ |
| Less value of St. Stephen | $-(CR+DT)$ |
| Less value of production from base capacity at Jefferies after rediversion | $-(ER+GT)$ |
| Less value of production from added capacity at Jefferies after rediversion | $-(FS+HU)$ |

RESULTANT ANNUAL CREDIT =

(6)  See page A-4 for derivation.  Use fixed charge for capacity over the service life (30 years).  Final value will be fixed in accordance with paragraph 6.1.

(7)  See page A-5 for derivation.  Use fixed charge for capacity over the service life (30 years).  Final value will be fixed in accordance

18

with paragraph 6.1.

(8)  Furnished monthly by the Authority (See Exhibit C).

(9)  Furnished annually by FPC in accordance with paragraph 6.1.
Current value shown.

EXAMPLE (Assuming 10,000,000 KWH generated with 84,000 KW added capacity)

|  | | | Numerical Example | Assigned Letters |
|---|---|---|---|---|
| **JEFFERIES VALUE (BEFORE REDIVERSION)** | | | | |
| Capacity: | 128,000 KW at $48 | = | $ 6,144,000 | AR |
| Energy: | 657 million KWH at 10.76 mills | = | 7,069,320 | BT |
|  | | Total | $13,213,320 | (AR+BT) |
| **ST. STEPHEN VALUE** | | | | |
| Capacity: | 84,000 KW at $ 48 | = | $ 4,032,000 | CR |
| Energy: | 418 million KWH at 10.76 mills | = | 4,497,680 | DT |
|  | | Total = | $ 8,529,680 | (CR+DT) |
| **JEFFERIES VALUE (AFTER REDIVISION)** | | | | |
| Base Capacity: | 44,000 KW at $ 48 | = | $ 2,112,000 | ER |
| Energy with Base Capacity: | | | | |
|  | 119 million KWH at 10.76 mills | = | 1,280,440 | GT |
|  | | Total = | $ 3,392,440 | (ER+GT) |
| Added Capacity: | 84,000 KW at $ 11.85 | = | $ 995,400 | FS |
| Energy with Added Capacity: | | | | |
|  | 10 million KWH at 36.8 mills | = | 368,000 | HU |
|  | | Total = | $ 1,363,400 | (FS+HU) |

19

SUMMARY CALCULATION

| | | |
|---|---|---|
| JEFFERIES VALUE (BEFORE REDIVERION) | $ 13,213,320 | +(AR+BT) |
| ST. STEPHEN VALUE | -8,529,680 | -(CR+DT) |
| JEFFERIES VALUE (AFTER REDIVERSION) | | |
|   BASE CAPACITY | -3,392,440 | -(ER+GT) |
|   ADDED CAPACITY | -1,363,400 | -(FS+HU) |

        RESULTANT ANNUAL CREDIT     =     -$  72,200 (10)

(10)  Resultant value of annual energy loss = BT-DT-GT-HU = $ 923,200
Resultant value of annual capacity gain = CR+ER+FS-AR = $ 995,400
Credit is net to Government if capacity gain exceeds energy loss.
Credit is net to Authority if energy loss exceeds capacity gain.

VALUE OF CAPACITY (11)
STEAM ELECTRIC EQUIVALENT

A.  Plant Investment               $ 350.00/KW     $/KW

B.  Annual Capacity Cost

| | Percent | |
|---|---|---|
| 1.  Fixed Charges | | |
|   a.  Cost of Money to Authority | 7.50 | |
|   b.  Depreciation (30 yr sinking fund with interest at 7.5%) | 0.97 | |
|   c.  Interim Replacements | 0.35 | |
|   d.  Insurance | 0.25 | |
|   e.  Taxes (in lieu of) | 0.10 | |
|     Total Fixed Charges | 9.17 | $32.10 |

2.  Annual Carry Costs of Fuel Inventory
  (9300 BTU/KWH, Plant Factor - .65)
  (90 day supply)
    11.1 MBTU = $ 1.32/MBTU x 7.85%       1.36

3. Fixed Operating Costs

      a. Fuel - 4.3 MBTU x $ 1.32/MBTU         5.68

      b. Operation and Maintenance = 2.11 x 1.575     3.32

      c. Administration (39% of above)         1.29

4. Annual Capacity Cost                 $43.75
5. Hydropower adjustment at 10%          4.38

6. Total Capacity Cost                  $48.13

                           Say   $48.00

NOTES
    (11)   Values shown furnished by FPC (Washington Office) letter dated 4 March 1976. Actual contract value will be established in accordance with paragraph 6.1.

VALUE OF CAPACITY (11)
GAS TURBINE EQUIVALENT

A. Plant investment             $115/KW              $/KW

B. Annual Capacity Cost

  1. Fixed Charges            Percent

    a. Cost of Money to Authority     7.50

    b. Depreciation
       (30 yr sinking fund with
       interest at 7.5%)         0.97

    c. Interim replacements       0.35

    d. Insurance              0.25

    e. Taxes (in lieu of)         0.10

       TOTAL FIXED CHARGES    9.17            $10.55

| | |
|---|---|
| 2. Annual Carry Costs of Fuel Inventory | .21 |
| 3. Annual Capacity Cost | 10.76 |
| 4. Hydropower Adjustment at 10% | 1.08 |
| 5. Total Capacity Cost | 11.84 |
| | Say $11.85 |

## JEFFERIES HYDRO PLANT
## AMOUNT OF ENERGY BEFORE REDIVERSION

The amount of energy that could have been produced by the Jefferies hydro plant before rediversion shall be the annual summation of computations on a weekly basis using the following formula:

B    KWH/wk    =    (G+H)    KWH/wk    +V    cfs/wk    x    823

B,G,H - See definitions on page A-1

V        - Average weekly cfs flow rediverted through St. Stephen, and/or spilled because of reduction in St. Stephen capability, provided that the water could have been used at Jefferies, absent rediversion.

Constant 823 - The figure of 823 equals the product of 168 hours and 4.9 kw/cfs, the latter ratio being the amount of net power in kilowatts typically producible at Jefferies per cfs discharged through the turbines. That figure varies somewhat (particularly with reservoir levels) but the yearly average is normally with 1 or 2% up or down. If the generating efficiency or Jefferies were to deteriorate significantly in the future as indicated by a declining ratio, the formula will be adjusted accordingly.

(R4, tab 2 at 30-35)

46. The contract contains the FERC's formula for capacity evaluation.

22

*Events after Performance Commenced*

47. The record indicates that approximately 10 years after executing the contract representatives of the government may have expressed doubts about the enforceability of the contract. Notes prepared by the government of a meeting conducted by the parties in September 1987 indicate the Authority asserted that it considered the contract to be a legally-binding contract and that the government shared this view (R4, tab 55 at 1337-38).

48. The September 1987 meeting was held in part to discuss a claim concerning capacity values the Authority had submitted (R4, tab 55 at 1336). The agenda for the meeting indicates the parties were to discuss revising paragraph 6.1.a, to "Settle capacity values for first thirty years (refer to claim[9]), provide method of establishing values for last 20 years, and provide for FERC arbitration" (R4, tab 55 at 1340-41). The government subsequently proposed adding the following language to paragraph 6.1: "The capacity values for the last 20 years will be established following the same procedures and shall be fixed as of a date 18 months prior to its effective date" (R4, tab 4 at 115-16).

49. The record reflects that the government maintained this latter position through the December 1, 1987 meeting between the parties to discuss the then outstanding issues between the parties (R4, tab 58 at 1359-61). The government proposed using the same methodology used for establishing the value for the first 30 years to establish the capacity value for the final 20 years of contract performance, but using October 2013 (18 months prior to its use in March 2015) cost data regardless of whether the parties used steam electric or gas turbine as the replacement to compare it to under the FPC valuation methodology (R4, tab 57 at 1350-51). The record includes notes the government made following the parties' December 1, 1987 meeting which were forwarded to the Authority under date of December 4, 1987 (R4, tab 58 at 1354-58). The government's notes indicate with respect to the government's proposed changes to paragraph 6.1a that the Authority agreed in concept with the government's proposal, but that the Authority "would prefer to address this item at a later date after the capacity value issue is settled" (*id*. at 1356 ¶ 8). Although the Authority responded to the government's meeting notes, providing its own comments for clarifications, the Authority expressed no opposition or other comment with regard to the assertion made by the government that it had agreed in concept to the proposed change to paragraph 6.1, but preferred to address this issue at a later date (*id*. at 1352-53). The record includes no evidence that this issue has ever been revisited by the parties until now.

---

[9] The referenced claim was part of the dispute resolved in *South Carolina Public Service Authority*, 89-3 BCA ¶ 21,921; and 91-2 BCA ¶ 23,760 and is not part of the record in these appeals.

50. In July 1987, the Authority learned that the contracting officer, on the advice of counsel, was questioning whether the government was authorized to make the annual settlement payments under the contract. The Authority requested a meeting to discuss this issue.

51. In August 1987, following a meeting with the Authority, the contracting officer wrote to the Authority, asserting that the contract was a legal binding document under which appropriate payments would be made by the government.

52. The validity of the contract issue was revisited in December 1987 and the government again confirmed that it considered the contract to be a valid binding agreement (R4, tab 58 at 1355 ¶¶ 4-5a.).

53. In view of the government's questioning of its authority to make annual payments under the contract, the Authority wrote to the Secretary of the Army, in February 1988. The Authority requested assurances that in the Secretary's view the contract was valid, and that the government was authorized to, and would, make annual settlement payments thereunder.

54. In April 1988, the Assistant Secretary of the Army, on the advice of the Corps' Chief Counsel, advised the Authority that the contract was valid, and that the Corps would abide by its commitments under the contract.

55. By letter dated September 3, 2015, the government notified the Authority that the values for the added dependable capacity for the first 30 years of the contract's performance period had expired on March 23, 2015. The government's letter stated the parties had had many discussions regarding the values to be used for the remaining period of the contract's performance, but had been unable to reach an agreement. The letter also stated the government had determined the values for the period from March 23 to June 30, 2015 based "on current industry standard rates noted in the U.S. Energy Administration's *Updated Capital Cost Estimates for Utility Scale Electricity Generating Plants* (April 2013)." The government asserted that use of this methodology resulted in a credit of $716,874.78, for which the government requested payment. (R4, tab 5 at 118)

56. As defined by the FPC "dependable capacity" of a hydroelectric plant is the capacity, which under the most adverse flow conditions of record can be relied upon to carry system load, provide dependable reserve capacity, and meet firm power obligations, taking into account seasonal variations and other characteristics of the load to be supplied (R4, tab 11 at 518). The FPC normally evaluates electric power in terms of two components, capacity and energy (*id*. at 517). The capacity value with respect to hydroelectric plants is derived from a determination of the fixed costs of the selected alternative source of supply. The energy value is determined from those costs of the

alternative, which relate to and vary with the energy output of the alternative plant. These capacity and energy components or power value are usually expressed in terms of dollars per kilowatt per year of dependable capacity and mills per kilowatt-hour of average annual energy. (*Id.*)

57. Exhibit A initially included the following with respect to "Power Values":

CAPACITY

| R | Steam electric base | $48/KW (6) |
|---|---|---|
| S | Gas turbine base | $11.85/KW (7) |

ENERGY

| T | Steam electric | 10.76 mills/.KWH (8) |
|---|---|---|
| U | Gas turbine | 36.8 mills/KWH (9) |

. . . .

(6) See page A-4 for derivation. Use fixed charge for capacity over the service life (30 years). Final value will be fixed in accordance with paragraph 6.1.

(7) See page A-5 for derivation. Use fixed charge for capacity over the service life (30 years). Final value will be fixed in accordance with paragraph 6.1.

(8) Furnished monthly by the Authority (see Exhibit C).

(9) Furnished annually by FPC in accordance with paragraph 6.1. Current value shown.

(R4, tab 2 at 41)

58. Pursuant to supplemental agreement No. 6 the parties amended exhibit A. In addition to reducing the St. Stephen annual energy amount attributable to the agreed upon capacity for St. Stephen of 84,000 KWH from 418,000,000 KWH to 369,000,000 KWH, the parties revised the "Power Values" as follows:

25

CAPACITY

| | | |
|---|---|---|
| R | Steam electric base | $202.25/KW (6) |
| S | Gas turbine base | $33.96/KW (7) |

ENERGY

| | | |
|---|---|---|
| T | Steam electric | VARIES (8) |
| U | Gas turbine | VARIES (9) |

. . . .

(6)  See page A-3 for derivation.  Original values acknowledged by Charles A. Donnell for the Corps and William C. Mescher for Santee Cooper, in letters dated November 23, 1984 and December 7, 1984, respectively.

(7)  See page A-4 for derivation.  Original values acknowledged by Charles A. Donnell for the Corps and William C. Mescher for Santee Cooper, in letters dated November 23, 1984 and December 7, 1984, respectively. Subsequently revised in decision by Corps of Engineers, Board of Contract Appeals, Docket #ENG-BCA-5564.

(8)  Furnished monthly by the Authority (see Exhibit C).

(9)  Furnished monthly by the Authority (see Section 6.1.b).

(R4, tab 2 at 40, 75-85)  Review of the pages A-3 to A-5, cited in footnotes (6) and (7) indicates that the parties significantly revised the underlying values and assumptions underlying the capacity values corresponding to R (steam electric base) and S (gas turbine base) (*cf. id*. at 43-44, 83-84).  The parties also revised the value used for D, the energy attributable to the St. Stephen plant capacity, in the exhibit A credit computation formula.[10]  This value was reduced from the 418,000,000 KWH included in exhibit A originally, to 369,000,000 KWH set forth in the revised exhibit A.  (*cf. id*. at 40, 81)  The record does not include evidence explaining why the underlying values

---

[10] Value of Jefferies (before rediversion)  +(AR+BT) Less value of St. Stephen-(CR+DT)
        Less value of production from base capacity at Jefferies after rediversion-(ER+GT)
        Less value of production from added capacity at Jefferies after rediversion-(FS+HU)
        (R4, tab 2 at 41, 82).

and assumptions were changed, how the revised values were derived, or the parties' negotiations regarding the changes.

59. By letter dated October 2, 2015, the Authority responded to the government's September 3, 2015 letter. The Authority advised it disagreed with the government's interpretation of the contract and requested a final decision by the contracting officer determining that no further payment was owed by the Authority for added capacity beyond March 23, 2015. (R4, tab 3 at 99-102)

60. By letter dated February 2, 2016, the contracting officer issued a final decision (R4, tab 1 at 1-10). In the final decision the contracting officer advised the Authority that it was misinterpreting the contract and that the Authority was obligated to credit the government with the value of the additional capacity provided by the St. Stephen plant for another 20 years (*id*. at 8-9).

61. The Authority timely filed its notice of appeal from the contracting officer's final decision on February 26, 2016.

62. The record includes evidence that the St. Stephen plant has continued to produce electric energy for the Authority's benefit as recently as May 2017 (R4, tab 59 at 1365-67).

*Jurisdiction Issue*

63. The Authority pled jurisdiction arises from a timely notice of appeal from a contracting officer's final decision denying a certified claim submitted under the contract, which the government mostly admitted (compl. ¶¶ 3-5; answer ¶¶ 3-5). No further facts were pleaded by the parties with respect to jurisdiction and the parties did not specifically plead that jurisdiction exists under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (CDA).

64. The contract was entered into in 1976, two years before the CDA was enacted (finding 38). The CDA states that it applies to any express or implied contract entered into by an executive agency for (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of real property. 41 U.S.C. § 7102.

65. In supplemental agreement No. 8, the Authority agreed to replace the analog electric actuators used in the operation of the government's St. Stephen's plant with digital controls, for which services the government paid the Authority (R4, tab 2 at 87-89). The Authority provided additional services to the government for which it

was compensated pursuant to supplemental agreement Nos. 4 and 9 as well (*id.* at 67-72, 90-92).

66. Although not specifically referred to as modifications to the contract, the record indicates the parties treated the supplemental agreements as modifications to the contract and not as separate, indivisible contract agreements. Supplemental agreement No. 6 expressly deletes certain provisions of the original contract and replaces them with revised provisions (R4, tab 2 at 75-80). Supplemental agreement Nos. 1 and 2 expressly state they are an amendment to the original contract and also delete and add provisions to the original contract (*id*. at 52, 57).

## DISCUSSION

*The Board's Jurisdiction to Consider these Appeals*

The contract involved in these appeals is relatively unique. It predates the enactment of the CDA in 1978, which at this point in time, 40 years later, is a relatively unusual circumstance to encounter. This is due to the fact that the contract performance period is 50 years, measured from commencement of the operation of the government's St. Stephen plant, an event which did not occur until almost 10 years after the contract was executed. This is another factor that sets it apart from most government contracts. The nature of the contract, which is to settle a dispute between the parties regarding the loss of value to the Authority from the government's interference with the operation of its Jefferies plant, and value added through the added St. Stephen plant is also unusual. The concept involved in the contract, to settle this dispute and keep the Authority whole, is relatively simple, but its execution, particularly the calculation of the values to be applied to each of the credits the parties are responsible for under the agreement are somewhat complex and indefinite, in the sense that the values were not set at the time the contract was entered into, are somewhat subjective and are also subject to change depending on several variables. For example, the flow of water through the Jefferies plant and the power produced thereby, the power produced at St. Stephen and how much of it is taken by the Authority, and the energy values to be obtained annually from the FPC and monthly from the Authority. (Findings 20, 25-28, 30, 40, 43, 45, section 6.1 (a)-(c)) Additionally, the record includes evidence that the Authority was reluctant to agree to extend the energy value for the gas turbines established and used in the methodology set forth in the contract (exhibit A) for the past 30 years due to the possibility that the assumptions those values were based upon in the 1970s, when the agreement was negotiated, would no longer hold true after 30 years (findings 27, 32).

The record indicates that representatives of the government in the past have asserted the contract might not be valid (findings 47, 50, 52-54). The basis for these past assertions that the contract might not be valid are not set forth in the record in this

appeal. Although neither party is currently contesting the validity of the contract, given the unique nature of the contract, coupled with the indefinite nature of the value of the credits to be paid, we deem it prudent to address these issues because our subject matter jurisdiction under the CDA is ultimately dependent on the existence of a valid contract. *Abdul Khabir Construction Co*., ASBCA No. 61155, 18-1 BCA ¶ 37,027 at 180,296 citing *Ryste & Ricas*, *Inc*., ASBCA No. 54514, 06-1 BCA ¶ 33,124 at 164,146 *aff'd. Ryste & Ricas*, *Inc*. v. *Harvey*, 477 F. 3d 1337 (Fed. Cir. 2007). *See also Atlas International Trading Corporation*, ASBCA No. 59091, 15-1 BCA ¶ 35,830 at 175,198; *Dongbuk R&U Engineering Co*., ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,639 (motion for summary judgment granted based on lack of jurisdiction due to fraudulently obtained contract being void *ab initio*).

Under the CDA we have jurisdiction to "decide any appeal from a contracting officer of any executive agency relative to a contract made by that agency." 41 U.S.C. § 7105(e)(1)(A). However not all contracts are encompassed by the CDA. The CDA covers express and implied contracts made by an executive agency for: (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property. *Id*. § 7102 (a). Thus two potential jurisdictional pitfalls present themselves in the circumstances of this case; (1) is the contract valid, despite its indefinite nature and (2) is it a type that is covered by the CDA?

*A. The Contract's Validity*

The Federal Circuit has stated that the elements of a valid contract are:

> (1) Mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract.

*Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012); *Suess v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1265 (Fed. Cir. 2005). There is nothing in the record that suggests these requirements have not been met. The lengthy period of negotiations leading up to the contract, followed by the contract's execution, express affirmation of the contract's validity by the parties 10 years into the performance period and continued performance to date, are all evidence of an intent to contract. The respective credits to be paid and other obligations of the parties set forth in the agreement satisfy the requirement for consideration and there is no reason to doubt the authority of the representative of the parties who signed the agreement to bind the parties in contract.

29

While the terms are unambiguously stated, they do include a degree of indefiniteness or uncertainty, which in some circumstances has been recognized as a basis for ruling contracts invalid. *See Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195 (10th Cir. 2000) for an example of a contract found to be too indefinite to be enforceable.

The Restatement (Second) of Contracts § 33 states:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

and the Restatement (Second) of Contracts, § 34 states:

> (1) The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.
>
> (2) Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.
>
> (3) Action in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.

These appeals bears some resemblance to *Kenai v. Ferguson*, 732 P.2d 184 (S. Ct. Alaska 1987), where an agreement was held to be valid and enforceable despite the parties inability to agree on payments to be made in the future under a 55-year lease agreement, which included an indefinite provision for renegotiating the lease payments at five year intervals. The provision at issue in *Kenai* stated:

> In the event this lease is for a term in excess of five years, the amount of rents or fees specified herein shall be subject

> to re-negotiation for increase or decrease at intervals of *EVERY FIVE* Years from the 1st day of July preceding the effective date of this lease.

The *Kenai* renegotiation provision is indefinite because it includes no specified amount for future payments, or even any methodology for calculating same. It is merely an agreement to agree in the future. The court held the agreement to be enforceable and that the intent of the parties, which it discerned from the entirety of the agreement, was for the payment of a reasonable fair market rent. The court stated a court could determine what a reasonable fair market rent was if the parties were not able to come to an agreement. *See also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E. 2d 203, 206 (N.Y. 1989) (citations omitted) (noting that "a price term is not necessarily indefinite because the agreement . . . leaves fixing the amount for the future").

In these appeals, although the amounts of the credits are indefinite and the assumptions underlying them appear to be both subjective and subject to variation depending at least in part on when they are made, the contract includes a methodology set out in exhibits A-D for calculating the values of the credits due under the contract, which the parties agreed to and have used for the past 30 years; even making significant revision thereto, presumably to maintain the equitable nature of the agreement, although the record includes no evidence to explain how the parties agreed upon the revisions made to the valuation methodology (findings 20, 25-26, 28, 31-37, 45, 57-58). Due to this pricing methodology we find the contract is sufficiently definite to be valid and enforceable, particularly in light of the significant performance that has occurred and the parties' respective reliance upon same over the 41 years since the contract was executed. Restatement (Second) of Contracts § 34(2), 3). *See also Premier Exhibitions, Inc. v. Marmargar, Inc.*, 908 F. Supp. 2d 741 (ED Va. 2012).

*B. The Type of Contract Involved*

The contract includes services provided to the government, which provides subject matter jurisdiction under the CDA, as we previously held in *South Carolina Public Service Authority*, ASBCA No. 57826, 13 BCA ¶ 35,239 at 173,008-09. These services include regulating the flow of water into the Cooper River, purchasing the electricity produced from the government's St. Stephen plant via the credit system established in the contract, maintaining and operating the cooling water system, maintaining the transmission lines from the St. Stephen plant and other government owned equipment, and operating the St. Stephen plant remotely (finding 43). In addition to regulating the flow of water in the Cooper River, etc., the Authority has provided other services under the contract's modifications. For example the Authority replaced analog control equipment with digital controls pursuant to supplemental

agreement No. 8 and provided other services under supplemental agreements Nos. 4 and 9 (finding 65). Accordingly, the contract, which includes the provision of significant services to the government, is covered by the CDA and thus confers subject matter jurisdiction.

*The Dispute*

The government's position is that the contract requires the Authority to continue paying the credit for the value of the additional capacity provided by the St Stephen plant for the full 50-year performance period covered by the contract (gov't br. at 18-20). The Authority maintains the parties have agreed to make payment for the additional capacity for only the first 30 years of the contract (app. br. at 37-39). In this regard the Authority contends: "Section 6.1 and 6.1.a specify that the value of capacity 'shall be computed in accordance with the procedure shown in Exhibit A' and that the values of capacity 'will prevail for a 30-year service life'" (app. br. at 39 citing R4, tab 2 at 24-26). There is no provision in section 2 (Obligations of the Authority), or section 6 (Settlement), or exhibit A which specifically requires (or obligates) payment after 30 years or sets forth any methodology or value for payment after expiration of the 30-year payment period (*id*. at 39).

The government asserted its right to receive payment for the value of the additional capacity after the completion of the first 30 years of performance (finding 55). The Authority rejected this interpretation of the contract and requested a final decision from the contracting officer (finding 59). The contracting officer issued a final decision disagreeing with the Authority's position, which the Authority timely appealed (findings 60-61). We are thus asked to interpret the contract.

We begin, as we must always do when faced with issues of contract interpretation, with the language of the contract. *TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). When the language is unambiguous it must be given its "plain and ordinary" meaning and we may not look to extrinsic evidence to interpret the language. *Id*. Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we may consider it to confirm that the parties intended for the language to have its plain and ordinary meaning. *Id*. (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). Any issue of contract interpretation requires consideration of the contract as a whole to effectuate its spirit, giving reasonable meaning to all of the contract's terms. *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002).

Neither party asserts the language of the contract is ambiguous, they simply draw different conclusions as to what the language means. We agree the language is clear and without ambiguity. Although the parties have different interpretations of the contract's language, we do not find the language to be ambiguous because we find the

Authority's interpretation to be unreasonable. In order to be determined to be reasonable, the interpretation must be logically consistent with the contract and the parties' objectively ascertainable intentions. *ECCI-C Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145 at 176,418. The Authority argues, relying upon the principle of interpretation referred to as *expressio unius est exclusio alterius*, that the failure of the agreement to expressly state that payments for the value of the additional capacity will be required beyond the 30-year service life period set forth in section 6.1 of the contract, coupled with no similarly stated period with respect to the energy credits due from the government for the reduced capacity of the Authority's Jefferies plant, presumes there is no requirement for capacity payments to be made after thirty years (app. br. at 39). *See also SYMVONICS, Inc.*, ASBCA Nos. 60355, 60612, 17-1 BCA ¶ 36,790. This interpretation is unreasonable because it is not logically consistent with the contract and is contrary to the spirit of the agreement when all of its provisions are considered.

The contract clearly and unambiguously requires the Authority to continue paying for the benefit of the added capacity it receives from the St. Stephen plant upon the plant becoming operational through the full 50 years of the contract's performance period. This begins with the recital that states that the parties desire that the government be compensated for the project's benefits to the Authority. (Finding 38) Next, paragraph 3.2 of the contract states that the obligation to pay for the power delivered commences upon the operation of the St. Stephen plant and continues for 50 years (finding 44). The "Settlement" provision of the contract, paragraph 6, which sets forth the various credits to be calculated and paid for under the contract states that beginning with the date of commercial operation and continuing for each succeeding contract year, there will be a cash settlement reflecting the net value of the credits to be paid by the parties, including the credit for the increased available capacity. The "Payment" provision of the contract, paragraph 7, requires that the payments due under the contract be made until title to the St. Stephen plant passes to the Authority, an event not scheduled to occur until the 50-year performance period has been completed.[11] Finally, footnotes 6 and 7 to exhibit A indicate that a fixed charge for the capacity value over the 30-year service life will be followed by a "final" value fixed in accordance with paragraph 6.1. (Finding 45) Nothing in this contract language supports the argument advanced by the Authority that the contract obligates it to pay for the benefit of the capacity added by the St. Stephen plant for only 30 years.

The Authority does not argue that it is no longer receiving any benefit from the additional capacity of the St. Stephen plant, nor does the record include any evidence that this benefit is no longer being received by the Authority. The evidence in the

---

[11] Title transfer can be accelerated but neither party has argued this has occurred (findings 42, 44). Nor is there any evidence of this having occurred in the record.

33

record is that the Authority has continued to receive the benefit of the additional capacity provided by the St. Stephen plant, at least as recently as May 2017. (Finding 62) Accordingly, pursuant to the plain language of the contract, the Authority must continue to pay for this benefit in accordance with the methodology set forth in exhibit A pursuant to paragraph 6.1 of the contract, with current values obtained from FERC for the sub-components of the computation formula where needed. The Authority does suggest that the parties intended to amortize and pay for over 30 years, the 50-year value of the benefit the Authority was to receive from the additional capacity of the St. Stephen plant, but this contention is contrary to the language of the contract (app. br. at 43). Nor is there any evidence in the record to support this contention.

The record includes extrinsic evidence that confirms the plain language of the contract is what the parties intended. The record indicates that the concept, that there be a cash settlement, of the various credits to be paid, made at the end of each year after the St. Stephen plant became operational and that this procedure be in effect for 50 years, may have originated with the Authority. (Finding 10) The record includes evidence that the Authority viewed fixing the value for a key component of the exhibit A formula for the 50-year life of the agreement as being difficult to do beyond 30 years (finding 27). This tends to support the view that the contract only fixed the values underlying the net credit settlement system in the contract for the first 30 years of the agreement. The initial 30-year period that was spelled out in the contract corresponds to the FPC methodology for evaluating hydropower projects, which is based on an evaluation of an alternate thermal plant, which have 30-year service lives, adjusted for the greater operating efficiencies of hydro plants and service lives of 50 to 100 years (findings 8, 32, 34). This FPC methodology was incorporated into the contract (finding 46). The parties met several years after performance had commenced, in part to discuss the methodology to be used to settle the capacity values for the last 20 years of the contract's performance period, the issue that is raised in this appeal (findings 48-49). The government proposed using the same methodology used for the first 30 years, but waiting until 18 months prior to the effective date to obtain the current values from the FPC, similar to what the parties had done with respect to the first 30 years of the performance period (findings 37(e), 48-49). The record includes evidence the Authority agreed with this proposal, but wished to postpone decision on this issue until after the then pending dispute regarding the capacity value, the subject of the appeal in *South Carolina Public Service Authority*, 89-3 BCA ¶ 21,921, and 91-2 BCA ¶ 23,760 was resolved (findings 48-49).

## CONCLUSION

For the reasons set forth above, we find the language of the contract clearly and unambiguously requires the Authority to continue to make payment for the benefit received of the additional capacity provided by the St. Stephen power plant. These appeals are denied and remanded to the parties for negotiation of the value of the additional capacity for the final 20 years of the contract performance period in accordance with the provisions of paragraphs 3, 6, and 7 of the contract.

Dated: July 22, 2020

CHRISTOPHER M. MCNULTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

I concur in result (see separate opinion)

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

## OPINION BY JUDGE SHACKLEFORD AND JUDGE PROUTY
## CONCURRING IN RESULT

We concur in result because we agree with Judge McNulty regarding the Authority's obligations under this contract. We do not, however, necessarily agree with all of the other analyses in his opinion. Moreover, we find the section regarding the applicability of the Contract Disputes Act to this contract to unnecessarily revisit a matter previously decided (with the same result) in a prior appeal. *See South Carolina Public Service Authority*, ASBCA No. 57826, 13 BCA ¶ 35,239 at 173,010.

Dated: July 22, 2020


RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60460, 60616, Appeals of South Carolina Public Service Authority, rendered in conformance with the Board's Charter.

Dated: July 22, 2020


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals